STEPHEN W. OWENS - #6957
JAMES T. EGAN - #15479
NOURIN N. ABOURAHMA - #17647
**EPPERSON & OWENS, P.C.**
10 West 100 South, Suite 500
Salt Lake City, Utah 84101
Tel: (801) 983-9800
Fax: (801) 983-9808
sowens@eolawoffice.com
jegan@eolawoffice.com
nabourahma@eolawoffice.com
*Attorneys for Defendants Sean J. Henderson, D.O.,
Bradley C. Burton, PA-C, and Granger Medical Clinic, P.C.*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION**

| | |
|---|---|
| SARA PARADA, individually, and as parent/guardian acting for and on behalf of D.P., a minor child, | **RENEWED MOTION FOR SUMMARY JUDGMENT FOR DEFENDANTS** |
| Plaintiffs, | |
| v. | **(1) SEAN J. HENDERSON, D.O.;** |
| DAVID PENNINGTON, M.D.; PENNINGTON MEDICAL CENTER PLLC dba PENNINGTON WOMEN'S CENTER; IHC HEALTH SERVICES, INC. dba UTAH VALLEY HOSPITAL; IHC HEALTH SERVICES, INC. dba INTERMOUNTAIN MEDICAL GROUP; UNITED STATES OF AMERICA; <u>SEAN J. HENDERSON, D.O.; BRADLEY C. BURTON, PA-C; GRANGER MEDICAL CLINIC, P.C.</u>; and DOES I-X, | **(2) BRADLEY C. BURTON, PA-C; AND** |
| | **(3) GRANGER MEDICAL CLINIC, P.C.** |
| | Case No. 2:21-cv-00534-CMR |
| Defendants. | Judge Ted Stewart<br>Magistrate Judge Jared C. Bennett |

Defendants Sean J. Henderson, D.O., Bradley C. Burton, PA-C, and Granger Medical

Clinic, P.C. (hereafter referred to as "these Defendants"), by and through counsel, and pursuant

to Rule 56 of the Federal Rules of Civil Procedure, hereby file this Renewed Motion for Summary Judgment for these Defendants. This motion was previously filed on April 19, 2022 (Doc. 54), then voluntarily withdrawn to permit additional discovery. That discovery has now taken place, and therefore this motion is refiled.

## INTRODUCTION AND REQUESTED RELIEF

This is a medical malpractice action against several health care providers. Plaintiffs allege that the Defendants were negligent in their medical care of Sara Parada and her unborn child, D.P. Plaintiffs asserts that this alleged negligence caused Ms. Parada and D.P. injuries.

The depositions of Defendants Sean Henderson, D.O. and Bradley C. Burton, PA-C (both as employees of Defendant Granger Medical Clinic, PC), have been taken. They testified at length about all aspects of their care of Sara Parada and her unborn child. They provide competent medical expert testimony that their care complied fully with the applicable standard of care and that their care did not contribute to any harm/damages to Sara Parada or D.P.

This expert opinion evidence is not disputed. No countervailing expert testimony has established the contrary. Consequently, Plaintiff cannot succeed in her claims against these Defendants, and the Court should thus grant these Defendants' motion for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Plaintiff's Complaint has one cause of action against these Defendants for "Negligence – Health Care Malpractice." The Complaint alleges that these Defendants negligently cared for Ms. Parada and D.P. Document 2 in Court file, Complaint at ¶¶145-151.

2. The deposition of Defendant Sean Henderson, D.O., was taken on April 12, 2022. All parties were represented at this deposition.

3. Dr. Henderson is a physician with specialty training in Urology. He stated, under oath, in part, as follows:

    A. Dr. Henderson was and is an employee of Defendant Granger Medical Clinic, P.C. (Exhibit 1, pp. 94-95).

    B. During the care at issue, he supervised his Physician Assistant, Defendant Bradley Burton, PA-C. Dr. Henderson was responsible for Mr. Burton's care. (Exhibit 1, p. 158).

    C. Based upon his background, education, training, and experience, Dr. Henderson and Mr. Burton fully complied with the appropriate standard of care in their care and treatment of Plaintiffs, and that they did not cause Plaintiffs' asserted injuries/damages. (Exhibit 1, pp. 157-158).

4. Defendant Bradley C. Burton, PA-C (Physician Assistant-Certified), was deposed on August 19, 2022. He similarly testified that he was an employee of Defendant Granger Medical Clinic, PC, and that he fully complied with the relevant standard of care in his treatment of Plaintiff Sara Parada. He denied that his care caused Plaintiffs any harm or damages. (Deposition transcript has not yet been produced, so no citation is provided).

5. After conducting certain discovery, Plaintiffs do not have an expert witness who will testify that these Defendants breached their appropriate standard of care or caused the Plaintiffs' claimed injuries/damages.

## APPLICABLE LEGAL STANDARDS

The applicable legal standard for summary judgment motions is set out in Rule 56 of the Federal Rules of Civil Procedure. Under this rule and the caselaw applying it, summary judgment is appropriate when there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Herland v. Izatt*, 2015 UT 30 ¶ 9. This Court should view the facts and indulge reasonable inferences in the light most favorable to Plaintiff, the nonmoving party. *Fitzgerald v. Spearhead Invs., LLC*, 2021 UT 34 ¶ 11.

In medical malpractice cases such as this one, plaintiffs must demonstrate (1) the standard of care required of physicians under similar circumstances practicing in the same specialty as the defendant physician, (2) the defendant physician breached that standard, (3) the defendant's breach proximately caused injury to the plaintiff, and (4) the plaintiff suffered damages. *Jensen v. IHC Hosps., Inc.*, 2003 UT 51 ¶ 96. The evidence for these claims must be supported by expert testimony. *Dalley v. Utah Valley Regional Medical Ctr.*, 791 P.2d 193, 195-196 (Utah 1990).

Expert testimony is required "because most medical malpractice cases depend upon knowledge of the scientific effect of medicine . . . [and] the causal link between the negligence and the injury are usually not within the common knowledge of the lay juror. Expert testimony thus ensures that factfinders have adequate knowledge upon which to base their decisions." *Ruiz v. Killebrew*, 2020 UT 6 ¶11 (internal citations omitted). There are exceptions to this rule, but those exceptions do not apply in this case.

## ARGUMENT

## THE COURT SHOULD GRANT THIS MOTION BECAUSE THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT THAT THE MOVING DEFENDANTS' MEDICAL CARE MET THE APPROPRIATE STANDARD OF CARE AND THAT THEY DID NOT CAUSE PLAINTIFFS' CLAIMED DAMAGES.

The undisputed facts are that these moving Defendants (Henderson, Burton, and Granger Clinic) appropriately cared for Ms. Parada and her unborn child. That medical expert testimony, given under oath, is not disputed by a countering expert. Plaintiffs have not produced an expert witness, affidavits, or evidence, to dispute this testimony.

Because Plaintiffs do not have an expert witness who will testify concerning the standard of care applicable to these Defendants in this case, that they breached the standard, and that this breach proximately caused Plaintiffs' alleged damages, there is no material fact in dispute and these Defendants are entitled to judgment as a matter of law. Plaintiff cannot maintain her allegations against these Defendants without such testimony.

## CONCLUSION

For the foregoing reasons, these Defendants request that this Court grant their Motion for Summary Judgment.

DATED this __24th__ day of August, 2022.

**EPPERSON & OWENS, P.C.**

/s/ Stephen W. Owens
STEPHEN W. OWENS
JAMES T. EGAN
NOURIN N. ABOURAHMA
*Attorneys for Defendants Sean J. Henderson, D.O., Bradley C. Burton, PA-C, and Granger Medical Clinic, P.C.*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **RENEWED MOTION FOR SUMMARY JUDGMENT FOR DEFENDANTS (1) SEAN J. HENDERSON, D.O., (2) BRADLEY C. BURTON, PA-C; AND (3) GRANGER MEDICAL CLINIC, P.C.** was served via the Court's e-filing service, and by e-mail transmission, on this 24th day of August, 2022, to the following:

G. Eric Nielson
Marianne P. Card
**G. ERIC NIELSON & ASSOCIATES**
4790 South Holladay Blvd.
Salt Lake City, Utah 84117
ericnielson@ericnielson.com
mariannecard@ericnielson.com
*Attorneys for Plaintiffs*

Robert G. Wright
Rafael A. Seminario
**RICHARDS BRANDT MILLER & NELSON**
111 East Broadway, Suite 400
P.O. Box 2465
Salt Lake City, UT 84110-2465
Robert-Wright@rbmn.com
Rafael-Seminario@rbmn.com
*Attorneys for Defendants IHC Health Services, Inc. dba Utah Valley Hospital; and IHC Health Services, Inc. dba Intermountain Medical Group*

J. Dave Ference
Derek J. Williams
**CAMPBELL, WILLIAMS, FERENCE & HALL**
3920 South 1100 East, Suite 250
Millcreek, UT 84124
dave@cwfhlaw.com
derek@cwfhlaw.com
*Attorneys for Defendants David Pennington, M.D.; and Pennington Medical Center PLLC dba Pennington Women's Center*

Amanda Berndt
Jeffrey E. Nelson
**US ATTORNEY'S OFFICE**
111 South Main, Suite 1800
Salt Lake City, UT 84111
*Attorneys for Defendant United States of America*
Amanda.Berndt@usdoj.gov
Jeff.Nelson@usdoj.gov

/s/ Julie Hooley

G:\SWO\Parada v. Henderson-Granger\PLEADINGS\US District - #2-21-cv-00534-CMR\Renewed MSJ - Henderson, Granger, Burton.doc



# SARA PARADA

vs

# DAVID PENNINGTON, M.D.

Case No. 2:21-cv-00534-CMR



# SEAN HENDERSON, D.O.

April 12, 2022



**ADVANCED REPORTING SOLUTIONS**

801-746-5080 | office@advancedrep.com | advancedrep.com
**SALT LAKE** | 159 West Broadway, Broadway Lofts, Suite 100 | Salt Lake City, Utah 84101
**PROVO** | 3507 North University Avenue, Suite 350-D | Provo, Utah 84604
**ST. GEORGE** | 20 North Main Street, Suite 301 | St. George, Utah 84770



Page 94

1  A.  No.
2  Q.  And you began practicing in Utah in
3  August 2016; is that correct?
4  A.  Yes.
5  Q.  Was that Granger Medical from the
6  beginning?
7  A.  No. It was Utah Valley Urology Clinic.
8  Q.  What happened --
9      THE COURT REPORTER: I didn't hear that. I
10 didn't hear the end of that.
11     MR. OWENS: Okay, let's hear the question
12 again, please.
13 BY MR. NIELSON:
14 Q.  What happened to your relationship with
15 Utah Valley Urology Clinic?
16 A.  Nothing. There was just a lot of separate
17 little urology groups. And to kind of protect
18 ourselves from the hospitals and stuff, so that we had
19 more of a say in patient care, we formed a big group
20 together. So I'm still partners with my original
21 partners.
22 Q.  So the big group is -- is that Granger
23 Medical?
24 A.  Yep, with all the rest of the doctors.
25 Q.  Are you an employee of Granger Medical?

Page 95

1  A.  Yes.
2      MR. OWENS: You get paid with W-2s?
3      THE WITNESS: I get paid with W-2s.
4  BY MR. NIELSON:
5  Q.  In December 2018, did you divide your week
6  up into clinic days and surgery days?
7  A.  Yes. We still do that now.
8  Q.  So would you please tell me the typical --
9  is it Monday, Tuesday, Wednesday are clinic days,
10 Thursday and Friday are surgical days?
11 A.  It's fairly similar to what I'm doing right
12 now, but I can't remember exactly, Eric. Usually
13 Tuesdays and Fridays were clinic, and Monday,
14 Wednesday, Thursday were the OR, but that changed just
15 depending on the need. If there were more patients
16 that need to be seen in the office, they would put me
17 in the office. If there were more procedures that they
18 needed done, they would put me in the operating room.
19 Q.  Would it be fair to say that you place at
20 least 250 stents a year?
21 A.  Yes.
22 Q.  Were you ever trained to place nephrostomy
23 tubes?
24 A.  Yes, for a specific procedure that we do,
25 but not routinely. So only if they have what's called

Page 96

1  a staghorn calculus, we'll go through their back to get
2  that. But I'll be honest with you, Eric, I know even
3  in my residency training that I wasn't very good at
4  that, so I still have the interventional radiologist do
5  that for me before I do that procedure.
6      MR. OWENS: Hey, Eric, I'm up for a
7  little -- another short break, when you get a minute.
8      MR. NIELSON: Okay. Let me just plow
9  through for a second.
10 BY MR. NIELSON:
11 Q.  Explain what it means to be the urologist
12 on call for your group, please.
13 A.  It depends on the hospital coverage, so we
14 have different areas. Some of my partners in Salt Lake
15 cover just IMC. Some cover three kind of community
16 hospitals. At the time, in 2018, that specific night,
17 I was covering Timpanogos and Utah Valley Hospital.
18 Q.  Okay. Are you still working in those two
19 hospitals?
20 A.  Yes.
21 Q.  Do you work --
22 A.  I'm sorry. Utah Valley, I've moved my
23 credentialing from Utah Valley up to American Fork
24 because it's closer to my home.
25 Q.  Okay. So now you work at Timp and --

Page 97

1  A.  American Fork Hospital.
2  Q.  American Fork, okay. Thank you.
3      MR. NIELSON: Let's take a five-minute
4  break. Is that okay with everyone?
5      MR. OWENS: So we brought sandwiches in.
6  Can we make it ten?
7      (Discussion off the record.)
8      (Recess taken from 1:10 p.m. to 1:30 p.m.)
9  BY MR. NIELSON:
10 Q.  Doctor, tell me, is the arrangement -- when
11 somebody is the urologist on call, is that a
12 contractual arrangement between you and Granger Medical
13 or is that a contractual arrangement between you and
14 the hospital?
15 A.  It's usually between us and the hospital.
16     MR. OWENS: "Us" meaning?
17     THE WITNESS: We as the urologists, the
18 urology group. It's not something -- we set it up.
19 It's not something through Granger.
20 BY MR. NIELSON:
21 Q.  Okay. So the Summit Group has an
22 arrangement with the hospital, they will have somebody
23 prepared to be the urologist on call on such and such a
24 date?
25 A.  Yes. But there are multiple hospitals

Page 154

1 Q. Thank you for that response. I appreciate
2 that.
3 In terms of -- have you worked with
4 Dr. Pennington before this?
5 A. Never.
6 Q. And have you worked with him since?
7 A. No.
8 Q. Have you heard anything about his
9 reputation amongst the hospital or nursing staff or
10 anything like that?
11 MR. OWENS: So vague as to timing.
12 THE WITNESS: And the answer is no.
13 Unfortunately, I didn't even see him in person when I
14 went over to talk to the patient, so I don't even know
15 what he looks like, other than the picture on his
16 deposition.
17 BY MR. SEMINARIO:
18 Q. So I'm assuming that your position is you
19 did the best you could, based on the information that
20 you had at the time, for example, at 11 o'clock that
21 night?
22 A. Yeah. And I don't think I'd word it "the
23 best I could." I think it's just standard of care.
24 It's what was to be expected.
25 Q. And I'm assuming you would say that you

Page 155

1 would always opt for having more information than less
2 information when determining what you could do to help
3 a patient?
4 MR. OWENS: Object to form.
5 THE WITNESS: Yeah, I mean, that's kind of
6 a leading question. The answer is always going to be
7 yes, but sometimes you can give too much information
8 and actually hinder care for the patient, right? So
9 there's always exceptions to everything, unfortunately.
10 BY MR. SEMINARIO:
11 Q. You were asked questions around the
12 midnight time frame. Were there other times during
13 that early morning that -- well, let me rephrase.
14 I think you've also testified you would
15 have wanted to have been called pretty much anytime
16 between midnight and 8:00 in the morning that day,
17 correct?
18 A. Yes.
19 Q. And is that because of the relatively low
20 blood pressure as opposed to any of the other vitals?
21 A. The blood pressure is the main concern, but
22 again, it's all of them in consideration together,
23 trying to figure out why she was tachycardic. If it
24 was from pain, I really wouldn't have cared that much,
25 but because of the compounding factor of low blood

Page 156

1 pressure, my first thought is that she's struggling,
2 her body's struggling, and that she's getting very ill.
3 So it's a combination. It's two or more.
4 It doesn't mean it's just two. Sometimes you have to
5 have three or four or five of these different things to
6 really figure out if you are diagnosing sepsis.
7 Q. Yeah, and I understand about the two or
8 more. I guess what I'm understanding from your
9 responses is it's two or more, but the most concerning
10 ones are temperature and blood pressure?
11 A. In my opinion, yes.
12 Q. Okay. Because, absent that, she clearly
13 had an elevated temperature, mild low-grade fever, her
14 saturation was a little on the low side at 11 o'clock,
15 her heart right was elevated between 113 and 131, and
16 her respiratory was at 124. I mean, those are four
17 vitals right there that are out of normal; would you
18 agree?
19 MR. OWENS: Object to form.
20 THE WITNESS: Yes, all except the fever.
21 The fever had resolved, from what I've been told. The
22 nurse never told me that there was a fever. And the
23 whole picture wasn't screaming she's septic.
24 MR. SEMINARIO: All right, Doctor, I have
25 no more questions.

Page 157

1 MR. OWENS: Okay. Who's up?
2 MR. NELSON: I have no questions.
3 MR. OWENS: So that's Jeff Nelson. Is
4 there anyone else? I'm going to ask a few questions.
5 This is Steve Owens.
6
7 EXAMINATION
8 BY MR. OWENS:
9 Q. Dr. Henderson, do you believe that your
10 care complied fully with the appropriate standard of
11 care for a board certified urologist in your treatment
12 of Sara Parada?
13 A. Yes.
14 Q. Do you believe any breach of care by you
15 caused any harm to Ms. Parada or her unborn child?
16 A. No.
17 Q. With regard to Mr. Burton, are you critical
18 of any of the care provided by your physician
19 assistant, Mr. Burton?
20 A. No.
21 Q. I think that there was some early
22 suggestion somewhere that maybe Mr. Burton had missed
23 that the patient was deteriorating. Do you agree or
24 disagree with that statement?
25 A. I disagree. I just don't think he had all

Page 158

1 the information yet.
2 Q. Right.
3 There was also some implication that it was
4 Dr. Pennington that first told you that the patient was
5 having difficulties. Is that true or not true?
6 A. That's not true. Brad told me before we
7 were working on her care before he called.
8 Q. Essentially the law, I think in 2018,
9 although it's changed I think a bit since then, was
10 that you are responsible for the care of your physician
11 assistant. Is that generally how you understand the
12 law?
13 A. Yes.
14 Q. And do you stand by Mr. Burton's care?
15 A. Yes.
16 Q. Do you believe he appropriately involved
17 you about abnormal findings that he discovered for this
18 patient?
19 A. Yes.
20 Q. And that was timely?
21 A. Yeah. Yes. Sorry.
22 Q. And then you immediately dropped everything
23 and got directly involved in the patient's care?
24 A. Yes.
25 Q. From the time he told you -- by the way,

Page 159

1 let's just put the time frame on that a little closer.
2 Did you have a patient scheduled for 8:30?
3 A. Yes.
4 Q. And did you see that patient?
5 A. No.
6 Q. And why is that?
7 A. Because we were on the phone with
8 interventional radiology.
9 Q. You?
10 A. Yeah, me. Sorry. Not Brad but me.
11 Q. All right. So Brad had told you, "There
12 are big concerns with these vital signs"?
13 A. Yes.
14 Q. And then you literally dropped everything
15 and -- your whole morning, essentially, to take care of
16 this patient?
17 A. Yes. Yeah. I was taking care of her until
18 about two o'clock in the afternoon.
19 Q. Do you believe Brad's care complied fully
20 with the appropriate standard of care for a physician
21 assistant under these circumstances?
22 A. Yes.
23 Q. And do you believe that he caused harm to
24 Ms. Parada or her child?
25 A. No.

Page 160

1 Q. You said Mrs. Parada credited you for
2 saving her life. Was that one or more times?
3 A. A couple times, when she came to the
4 clinic.
5 Q. And specifically, as closely as you can,
6 what did she say?
7 A. She just thanked me for saving her life and
8 for the care, taking care of her.
9 Q. Early on in the deposition, you were asked
10 about Campbell's Urology, and I think plaintiff asked
11 you about being authoritative, or some word to that
12 effect. Does Campbell's Urology set the standard of
13 care for a urologist?
14 A. It sets recommendations. Every patient's
15 different, but for the most part, if you follow those
16 recommendations, you'll stay out of trouble with, you
17 know, complications to patients. But everybody's
18 different. You have to treat the patient as a whole.
19 Q. Here's my question: Does Campbell's
20 Urology set the standard of care for your treatment of
21 Mrs. Parada?
22 A. No. There's a lot of gray area there.
23 Q. Campbell's Urology, as a textbook, doesn't
24 treat anyone; is that fair to say?
25 A. No. No. The standard of care. But

Page 161

1 treatment of the patient is the treating staff, not the
2 book.
3 Q. And there are thousands of references in
4 urology, and all hopefully contribute to your
5 education, but they don't actually treat patients; is
6 that fair?
7 A. They don't make the decisions for me. They
8 just help me decipher which is the best decision to
9 make.
10 Q. Another thing I was a little unclear of
11 earlier in your deposition is you were asked by
12 Mr. Nielson, "Did you try, literally try, to pull up
13 the imaging at your home for the CT exam on the evening
14 of December 13, 2018?" And I couldn't understand, you
15 could or could not pull them up, if you -- even if you
16 had tried?
17 A. I didn't have access. I couldn't pull them
18 up.
19 Q. All right. So then there were some
20 questions about whether you had tried, and I couldn't
21 tell if we were talking about Mrs. Parada specifically
22 versus like over the prior year. Comment, please.
23 A. Yeah, with Ms. Parada's case, I didn't have
24 access. Even if I tried, I wouldn't be able to pull up
25 the imaging, so I would have to go to my office or the